IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Detention of: | ) | No. 38815-8-III |
| | ) | |
| M.S. | ) | UNPUBLISHED OPINION |
| | ) | |

PENNELL, J. — M.S. appeals a 180-day involuntary treatment order. We affirm.

FACTS

M.S. has suffered from schizoaffective disorder, bipolar type, and alcohol use disorder for several years. M.S. traveled from western Washington to Spokane for alcohol treatment at American Behavioral Health Systems (ABHS) in 2021. He left ABHS and began a homeless lifestyle in Spokane on October 14, 2021.

On November 3, 2021, passersby discovered M.S. slumped over, unconscious, at a grocery store. He was brought by ambulance to Sacred Heart Medical Center, where his blood alcohol concentration was measured as 0.302 percent. At Sacred Heart, M.S. presented as disorganized: he did "not know how he came to be at the hospital," and he exhibited "incoherent mumbling," "brief eye contact," and he was hyperverbal with "sexually inappropriate language." Clerk's Papers (CP) at 2. He appeared tense and was placed in seclusion after becoming agitated and yelling.

M.S.'s mother was contacted, and she estimated that M.S. had spent only six to nine total months in the community in the previous three years, with the remaining time spent in hospitals and jails. The mother was unable to be involved in caring for M.S. because she had a protection order against him. Before being discovered passed out at the grocery store, M.S. had apparently visited the emergency room 10 times in the previous two weeks for alcohol intoxication and delirium. He had made 56 total emergency room visits in the previous year. M.S. later reported he was drinking a fifth of vodka daily prior to the November 3 admission. When asked where he would go or how he would feed himself if he was discharged from Sacred Heart, M.S. was unable to give meaningful answers.

Treatment professionals petitioned for 14 days of involuntary treatment on the basis of grave disability. A behavioral health evaluator testified that, although M.S. remained "pretty disorganized," he "may be approaching his baseline," so his treating psychiatrist had begun planning for discharge. Rep. of Proc. (RP) (Nov. 10, 2021) at 15, 21. M.S. had spent most of his time at Sacred Heart in seclusion due to yelling and agitation that necessitated security assistance. After a hearing, the superior court granted the petition for 14 days of involuntary commitment, concluding by a preponderance of the

2

evidence that M.S. had schizoaffective disorder and alcohol use disorder, and that due to those disorders, M.S. was gravely disabled.

In a subsequent petition, treatment professionals sought to involuntarily commit M.S. for 90 more days. At the court's hearing, a psychologist testified M.S. had "made very little to no progress," his psychotic symptoms persisted, and "he [was] not taking medications as prescribed or appropriately." RP (Dec. 1, 2021) at 54. Specifically, M.S. was refusing to take anything other than Tylenol, Benadryl, or Ativan—which the psychologist testified would not effectively address his psychiatric conditions—and that he had been discovered to have been crushing and snorting his Benadryl to get high. After the hearing, the superior court granted the petition to involuntarily commit M.S. for up to 90 days, concluding that the State had met its elevated burden of proving grave disability by clear, cogent, and convincing evidence. On December 7, 2021, M.S. was transferred from Sacred Heart to Eastern State Hospital.

The following February, M.S.'s attending psychiatrist at Eastern, Dr. Daniel Psoinos, petitioned for 180 additional days of involuntary treatment, alleging M.S. remained gravely disabled. A supporting affidavit from psychologist Dr. Gretchen Meader related troubling incidents. On several occasions in December and January, M.S. stole hand sanitizer and other cleaning fluids containing alcohol and drank them to

become intoxicated. Some of these thefts were surreptitious, but on at least two occasions he pushed past staff into the nursing station, desperate to obtain alcohol-based products.

Dr. Meader and social worker Mackenzie Bayless met with M.S. less than two weeks prior to the hearing on the 180-day petition. Before that meeting, Dr. Meader and Ms. Bayless hid hand sanitizer that was apparently usually in the room. During the meeting, M.S. showed improvement: he was "calm, expressed himself well with a linear thought process, and had adequate grooming and hygiene." CP at 48. "He was adamant in requesting immediate discharge, promising not to drink," but "[h]is body posture and mannerisms were noteworthy during this brief exchange in that he was actively scanning the room, straining his neck, leaning to one side, and then the other, even arching his back as if he was looking for something specific in the room." *Id.* Dr. Meader opined that M.S.'s compulsion to seek alcohol continued to require active management due to its exacerbating effects on his psychosis. She added, however, that M.S. "expressed willingness to discharge to inpatient substance use disorder treatment." *Id.* She noted that M.S.'s treatment team was "willing to pursue this" if M.S. continued to stabilize, but that the process of readying him would likely take several weeks. *Id*.

At the court's hearing, Dr. Psoinos testified, opining that M.S. remained fixated on obtaining alcohol, in part based on his recent successful efforts to steal and get drunk on

hand sanitizer. Dr. Psoinos also testified as to M.S.'s improvement, explaining that while "there are symptoms of lingering psychosis," M.S. was now "able to communicate overall coherently" and was "relatively stable." RP (Feb. 24, 2022) at 91-92, 95-96. Nevertheless, M.S.'s impulse control remained poor; the very morning of the hearing, he ran down the hall with a container of coffee and "drank as much of it as he possibly could, to the point where he vomited." *Id.* at 93. Dr. Psoinos testified that while M.S. was still reluctant to take his needed medications, M.S. had finally made an "agreement" with staff at Eastern to take them for now, and he had been medication compliant for six weeks, greatly alleviating his delusions. *Id.* at 92.

Eastern was not treating M.S.'s alcohol use disorder at the time of the hearing. Despite the overall improvement in his psychiatric symptoms, Dr. Psoinos noted that M.S. was "not really engaging with us" about "[h]is substance use disorder." *Id.* at 94. Dr. Psoinos explained that there were many treatment options Eastern could provide for substance use disorders, but that accessing those resources was necessarily contingent on an individual's willingness to engage. Such treatment would not typically be successful for a patient who had not meaningfully appreciated the need to remain sober. Treatment for alcohol use disorder could entail therapeutic intervention and medication that could curb cravings, but Dr. Psoinos opined that such treatment was not yet appropriate for

M.S., saying, "I definitely do not think [M.S.] meets the criteria" to begin such a course

of treatment. *Id.* at 106. M.S. had made conclusory promises that he would not drink

in the community, apparently motivated by a desire for discharge. But he had not, in

Dr. Psoinos's view, expressed a genuine willingness to quit, which Dr. Psoinos reiterated

was a prerequisite for substance abuse treatment to be successful.

Dr. Psoinos opined that M.S. had insight into his mental illness and his need for

treatment, and that there was a "fairly decent discharge plan" for M.S. *Id.* at 97-98. But

based on his observations of M.S., Dr. Psoinos also testified that he did not believe M.S.

would voluntarily take needed medications if he was discharged or that he would abstain

from substance use, which would be necessary for M.S.'s health and welfare. Dr. Psoinos

explained the connection between M.S.'s mental illness and his alcohol use:

> I have no intention of discharging him until we start seeing something
> happen about his really desperate craving for drugs and alcohol. . . . I think
> he would use alcohol promptly on discharge. . . . [H]is psychotic symptoms
> become much worse [when intoxicated]. . . . I think if he drinks excessive
> alcohol, which I'm quite confident he will, he won't remain in a stable
> place and he'll be on the streets, in and out of hospitals and jail.

*Id.* at 99-101, 104.

On cross-examination, Dr. Psoinos agreed that if M.S. did not crave alcohol, he

would be ready for discharge immediately. But on redirect, the State's attorney asked

Dr. Psoinos if he would be seeking to extend M.S.'s commitment if his only concerns

6

were alcohol related. Dr. Psoinos answered: "No, I probably would have discharged him after four days in the hospital." *Id.* at 112.

Ms. Bayless, M.S.'s social worker, also testified and explained she had observed "ongoing seeking of alcohol, . . . [as] well as just a lack of awareness about . . . his need for additional support at the time of discharge." *Id.* at 114. Ms. Bayless stated that, in her opinion, M.S. understands he has a mental health diagnosis but has told her he does not see a need for treatment for either a schizoaffective disorder or alcohol use. Ms. Bayless testified that she believed M.S. would begin drinking if discharged, and explained that alcohol exacerbates his psychotic symptoms such as disorganized cognition.

The superior court granted the petition to involuntarily commit M.S. for up to 180 additional days. The court concluded the State had shown, by clear, cogent, and convincing evidence, that M.S. had behavioral health disorders and that he was gravely disabled as a result. In its oral comments, the superior court explained that "I can't ignore the alcohol piece" because M.S.'s schizoaffective disorder and his alcohol abuse are "intertwined" and "go hand-in-hand." *Id.* at 123-26. The court memorialized this conclusion in its written order, crediting the experts' opinions that "[i]f discharged, [M.S.] would rapidly decline and be at substantial risk of harm." CP at 52.

7

M.S. appeals the 180-day commitment order.

ANALYSIS

The superior court ordered M.S.'s 180-day commitment on the basis of grave disability. *See* RCW 71.05.020(24); RCW 71.05.320(4)(d), (6)(a). M.S. does not challenge the court's finding that he is gravely disabled. Instead, he argues the order of commitment violates his due process rights because he has not been provided alcohol treatment, despite the fact that his alcohol cravings are preventing his release from detention. *See State v. Kidder*, 197 Wn. App. 292, 311, 389 P.2d 664 (2016) (recognizing that due process requires that the nature of an involuntary commitment bear a reasonable relation to the purpose for commitment).

M.S.'s due process argument rests on a mistaken assumption about the basis of his confinement. M.S. carries dual diagnoses of alcohol use disorder and schizoaffective disorder. As recognized by the trial court, these two conditions are intertwined such that each exacerbates the harms posed by the other. At the 180-day commitment hearing, professionals from Eastern State Hospital expressed concern that if M.S. were released, he would immediately resume drinking and then become mentally unstable due to his schizoaffective disorder. Thus, the trial court ordered M.S. detained based on the

combination of his alcohol use disorder and his schizoaffective disorder. M.S. was not detained solely because of his alcohol use.

The record indicates M.S. was receiving treatment for his schizoaffective disorder and that he would receive treatment specific to alcohol use once he made sufficient progress and demonstrated a genuine willingness to remain sober. At the hearing, the professionals from Eastern testified that while M.S. had made some progress in addressing his schizoaffective disorder, he had not yet gained insight into his condition sufficient to remain compliant with treatment outside a controlled hospital setting. Furthermore, M.S.'s alcohol-seeking behavior made clear that M.S. was not yet ready to benefit from alcohol treatment.

M.S. suggests that the superior court improperly sought a guarantee against relapse in order to allow release from involuntary treatment. We disagree with this assessment. The trial court did not order M.S.'s continued detention because of the mere possibility of relapse. Instead, M.S. was detained because he had not made any appreciable progress in preparing himself for successful discharge. This was an appropriate exercise of the trial court's authority.

No. 38815-8-III
*In re Det. of M.S.*

CONCLUSION

The order of commitment is affirmed.

A majority of the panel has determined this opinion will not be printed in

the Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Pennell, J.

WE CONCUR:

_____
Siddoway, J.

_____
Staab, J.

10